IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED

2013 JUN -7  PM 3: 24

CLERK U. S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____

**GRANT RAWSTON HEADIFEN,**
**Petitioner,**

-vs-

Case No.  A-13-CA-340-SS

**VANESSA HARKER,**
**Respondent.**

---

## <u>O R D E R</u>

BE IT REMEMBERED on May 29, 2013, the Court called a hearing in the above-styled

cause, at which Petitioner Grant Rawston Headifen, and Respondent Vanessa Harker both appeared

in person and through counsel.  Before the Court are Headifen's Verified Petition for Return of Child

to New Zealand [#1], Headifen's Request for Expedited Consideration [#2][1] of the same, Harker's

Answer [#17], Harker's Memorandum of Law in Support [#18], Headifen's Memorandum of Law

[#19], and Harker's Response [#20] thereto.  Having considered the arguments of counsel, the

evidence introduced at the hearing, the documents, the file as a whole, and the governing law, the

Court now enters the following opinion and orders, denying Headifen's Petition.

### Background

This case involves a petition for return of a minor to New Zealand, under the International

Child Abduction Remedies Act (ICARA) and the Hague Convention.  The USA and New Zealand

are both signatories of the Convention.  This Court has jurisdiction over ICARA disputes pursuant

to 42 U.S.C. § 11603(a).

---

[1]The Request for Expedited Consideration [#2] is GRANTED.



Headifen is a national and citizen of New Zealand, and a naturalized citizen of the United States. Headifen first came to the United States in 1984, and began an extended residence in this country beginning in 1985, initially on a student visa. He obtained a masters of engineering degree from the University of Texas at Austin. He then secured employment in Houston, Texas, and remained in the United States on a work visa. Headifen subsequently married an American citizen, and acquired United States citizenship thereby. Headifen and his first wife moved to Austin, Texas around 1991, and ultimately built a home, at 6201 Lost Horizon Drive. Headifen admits the deed, tax records, and other written documents all establish he is the sole legal owner of the Lost Horizon property to this day.[2]

Harker is a national and citizen of South Africa, and a naturalized citizen of the United States. They were married on September 16, 2005, in Austin, Texas. Headifen then sponsored Harker's United States citizenship. The minor who is the subject of Headifen's petition, A.H.H., was born to other parents in August 2008, in Austin. She was adopted by Headifen and Harker shortly thereafter.

The family moved to New Zealand on December 3, 2009. They lived there together until August 2012, when Headifen and Harker separated. Harker claims the move was intended to be temporary, motivated in large part by Headifen's wish to be with his aging mother in her final days, having been out of the country when his father passed away. Harker claims the family's time in New Zealand was expected to last no more than twelve to eighteen months, and they planned to return to

---

[2]Although Headifen testified at the hearing his brother owns a contingent share of half of the proceeds from the home should it ever be sold, he produced no written evidence of this purported agreement, which the Court finds not credible, barred by the statute of frauds, and irrelevant.

Austin afterwards, to raise A.H.H. in America. The family resided with Headifen's sister for the first four months, then leased a house in the Auckland area under an annual lease.

Unfortunately, the couple encountered both financial and marital difficulties in New Zealand. Headifen never obtained, and apparently never meaningfully sought, any gainful employment in New Zealand, other than his essentially self-employed efforts to grow an internet business (NauticEd) which offers sailing lessons online. Although Headifen had some $160,000 New Zealand dollars (approximately $130,000 in American currency) in savings, the proceeds from the sale of a New Zealand property, these savings were exhausted between 2009 and the present. At this time, Headifen professed the family was unable to move back to Texas because it was too expensive. After an abortive effort to start a clothing importer's business, Harker therefore sought and obtained employment in September 2010, landing a job with a New Zealand company, Warehouse Stationary. Harker apparently sought to save enough money to pay for the return to America. This job was initially under an annual contract, with a three-month notice period. The contract was extended to a permanent position the following year, still with a three-months notice requirement to terminate.

Harker threatened to separate from Headifen sometime in 2011. Although matters apparently improved somewhat for awhile, the family finances continued to suffer. In particular, Headifen remained essentially unemployed. The record shows his NauticEd internet business, far from being profitable, was operating at a loss in 2009 and 2010, and made only marginal annual profits in 2011, which were offset by carried-forward losses from the previous years. Headifen allegedly refused to pay any share of the couple's living expenses, thus frustrating Harker's efforts to save money for the return to the United States. With the couple's lease set to expire in mid-2012, Harker again sought to return to the United States. However, the couple instead separated in July or August 2012, with

-3-

Headifen moving back in with his sister, while Harker leased a different house.  The two agreed to have a "working separation," and Harker claims Headifen still agreed all three would eventually return to Austin.

After the separation in August 2012, the parents shared custody of A.H.H.: "From August of 2012 until on or about April 2, 2013, the Child lived with each parent in New Zealand, normally spending each Saturday, Sunday, Tuesday and Wednesday night with the Mother and the rest of the time with her Father who did pick-ups and drop-offs from day care and kindergarten."  Pet'r's Pet. [#1], ¶ 9.  This arrangement was simply an informal agreement between the parents, and no custody orders have been entered in either the United States or New Zealand, with the exception of a standard order issued by the district court of Travis County, noted below.

Harker claims she and Headifen still agreed to ultimately return A.H.H. to Austin, even after the two separated.  She asserts Headifen simply asked if they could wait until the end of the New Zealand summer (which ended in March) to move back to Austin.  According to Harker, this plan was abruptly rejected by Headifen when he announced, in a February 18, 2013 email, his new desire for A.H.H. to remain in New Zealand "for her schooling years."

At this point, Harker had already given three-months resignation notice to her employer.  She had also begun searching for work in the United States, including interviewing in November 2012 with Office Max in Chicago, allegedly regarding a satellite or remote position based in Austin. Harker also consulted a Texas family law attorney while in the United States in November, apparently regarding divorce proceedings in Texas.

After the February 18 email, Harker determined to unilaterally return with A.H.H. to the United States.  She accordingly, in secret, made travel plans for herself and the minor.  She also

arranged to have all their personal belongings shipped back to Austin, some of which included furniture or other personal items Headifen claims are his own property. On April 2, 2013, Harker emptied joint bank accounts for some $8,000, without Headifen's knowledge or permission. These accounts were allegedly Headifen's sole property at this time, under an unwritten agreement between the two, whereby Harker managed her own finances in New Zealand out of her own, separate accounts. As she was boarding the flight, Harker emailed Headifen, announcing what she had done.

Upon arrival, Harker immediately filed a divorce and custody suit in the 261st District Court of Travis County. That proceeding is presumably in abeyance pending this action. The state court has apparently issued its standard, mandatory "Standing Order Regarding Children, Property and Conduct of the parties."

Headifen reacted promptly, submitting an application with the "New Zealand Central Authority designated under Article 6 of the Hague [C]onvention," and this application was duly forwarded to the U.S. State Department. Headifen's American counsel filed this case on April 24. Headifen seeks both an order returning A.H.H. to New Zealand, and access to her while she is still in the United States.

In a series of orders, the Court previously set terms allowing Headifen temporary shared custody over A.H.H., and requiring counsel for each side to retain A.H.H.'s and their clients' passports and travel documents pending the outcome of this case. The Court also endorsed an expedited discovery process between the parties. Presently, having heard the arguments of counsel, the testimony of witnesses, including both Headifen and Harker, and having reviewed the documentary evidence and the governing law, the Court is now prepared to issue a final decision.

## Discussion

### I.   ICARA Legal Standard

"Under Article 12 of the Hague Convention, when a child has been 'wrongfully removed or retained,' the 'judicial or administrative authority of the Contracting State where the child is . . . shall order the return of the child forthwith.'" *England v. England*, 234 F.3d 268, 271 (5th Cir. 2000) (quoting CONVENTION ON THE CIVIL ASPECTS OF INTERNATIONAL CHILD ABDUCTION, Oct. 25, 1980, art. 12, 51 Fed. Reg. 10493, 10498 (1986)).

In deciding an ICARA petition, a court "plainly has jurisdiction to decide the merits of a wrongful removal claim, but it may not decide the merits of the underlying custody dispute." *Whallon v. Lynn*, 230 F.3d 450, 455 & n.5 (1st Cir. 2000).  Courts often look to the Perez-Vera Report which accompanied the Hague Convention and was issued by the official reporter of the Hague convention to determine the Convention's proper construction.  *Id.* at 455 & n.5.  In particular, the Perez-Vera Report provides the following guidance about the purpose and scope of jurisdiction:

> [F]rom the Convention's standpoint, the removal of a child by one of the joint holders without the consent of the other, is . . . wrongful, and this wrongfulness derives in this particular case, not from some action in breach of a particular law, but from the fact that such action has disregarded the rights of the other parent which are also protected by law, and has interfered with their normal exercise. The Convention's true nature is revealed most clearly in these situations: it is not concerned with establishing the person to whom custody of the child will belong at some point in the future, nor with the situations in which it may prove necessary to modify a decision awarding joint custody on the basis of facts which have subsequently changed. It seeks, more simply, to prevent a later decision on the matter being influenced by a change of circumstances brought about through unilateral action by one of the parties.

PEREZ-VERA REPORT § 71 (quoted in *Whallon*, 230 F.3d at 455–56); LEGAL ANALYSIS OF THE

HAGUE CONVENTION ON THE CIVIL ASPECTS OF INTERNATIONAL CHILD ABDUCTION, 51 Fed. Reg. 10503 (1986).

Under ICARA, Headifen bears the burden of proving, by a preponderance of the evidence, (1) A.H.H. was "wrongfully removed or retained," (2) New Zealand was A.H.H.'s "habitual residence" under the meaning of the Hague Convention,  (3) Headifen has parental rights as to A.H.H., and was exercising his parental rights when A.H.H. was removed.   42 U.S.C. § 11603(e)(1)(A)–(B).  Removal is wrongful under the Convention when:

> "(a) it is in breach of rights of custody attributed to a person . . . either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
>
> (b) at the time of the removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention."

*Kufner v. Kufner*, 519 F.3d 33, 39 (1st Cir. 2008) (quoting HAGUE CONVENTION, art. III).  Under ICARA, such wrongful removal includes a removal prior to entry of a custody order.  42 U.S.C. § 11603(f)(2).

There is no dispute Headifen has parental rights to A.H.H., nor is there any dispute Headifen was exercising those rights as of April 2, 2013.  Harker has not raised any defenses, and there is no question her removal of A.H.H. from New Zealand was "wrongful" under the Convention—if New Zealand is indeed A.H.H.'s habitual residence.  As is often the case in ICARA cases, resolution of Headifen's Petition turns on which country A.H.H. habitually resides in.[3]  *See Mozes v. Mozes*, 239 F.3d 1067, 1072 (9th Cir. 2001) ("'Habitual residence' is the central—often outcome-determinative—concept on which the entire system is founded.").

---

[3] There are four defenses under ICARA. *Miller v. Miller*, 240 F.3d 392, 397 (4th Cir. 2001).  However, Harker has not asserted any of them, and none appear applicable to the facts of this case.

The Hague Convention does not define habitual residence. *Id.* at 1071. This has been described as a "'matter of deliberate policy, the aim being to leave the notion free from technical rules which can produce rigidity and inconsistencies as between different legal systems.'"[4] *Id.* (quoting J.H.C. MORRIS, DICEY AND MORRIS ON THE CONFLICT OF LAWS 144 (10th ed. 1980)). However, a number of circuit decisions have taken up the challenge of giving definite meaning to a phrase which, to the international lawyers who drafted the Hague Convention was so "well-established" a concept as to need no further description. *Mozes*, 239 F.3d at 1071 (quoting PEREZ-VERA REPORT § 66).

Unfortunately, there is a circuit split on the proper framework for determining habitual residence. Although acknowledging the Fifth Circuit has come down on the other side of this question, Headifen cites to cases from the Third and Sixth Circuits, which focus on the minor's perspective, and the minor's acclimatization to the removed-from country. *See Feder v. Evans-Feder*, 63 F.3d 217, 224 (3d Cir. 1995) ("[A] child's habitual residence is the place where he or she has been physically present for an amount of time sufficient for acclimatization and which has a 'degree of settled purpose' from the child's perspective."); *Friedrich v. Friedrich*, 983 F.2d 1396 (6th Cir. 1993) ("To determine the habitual residence, the court must focus on the child, not the parents, and examine past experience, not future intentions.").

---

[4]The Court suspects an equally plausible explanation is the Convention delegates could not agree on anything more specific. It is often the case that a fortuitous vagueness is the axis on which international agreements turn. Also, while asserting habitual residence is a "well-established concept" may suffice in civil-law countries, where the law is as a judge reads it on any given day, it does not serve in the common-law nations, where the law develops predictable and reasoned structure by action of precedent. *See Mozes*, 239 F.3d at 1071 (quoting Perez-Vera Report § 66). Accordingly, while mindful of the need to ensure international uniformity in applying the Convention, American courts have not hesitated to employ all the usual tools of jurisprudence in deciding ICARA cases, including developing an analytical framework for applying "habitual residence" to the facts of a case. *See id.* at 1071–73.

Harker argues the Fifth Circuit has rejected the child-centric approach followed in the Third and Sixth Circuits, and has instead adopted an approach followed by most other circuits, which begins with shared parental intent.  The Court agrees.  In *Larbie v. Larbie*, the Fifth Circuit stated: "We join the majority of circuits that 'have adopted an approach that begins with the parents' shared intent or settled purpose regarding their child's residence.'"  690 F.3d 295 (5th Cir. 2012) (quoting *Nicolson v. Pappalardo*, 605 F.3d 100, 104 (1st Cir. 2010)).[5]

Under the shared-intent approach, "courts should begin an analysis of a child's habitual residence by considering the relevant intentions [of the parents]."  *Gitter v. Gitter*, 396 F.3d 124, 132 (2d Cir. 2005) (citing *Mozes*, 239 F.3d at 1074).  "This approach allows an observer to determine whether the child's presence at a given location is intended to be temporary, rather than permanent."  *Id.*  "[G]enerally speaking 'the first step toward acquiring a new habitual residence is forming a settled intention to abandon the one left behind.'"  *Id.* (quoting *Mozes*, 239 F.3d at 1075).  "[W]e will presume that a child's habitual residence is consistent with the intentions of those entitled to fix the child's residence at the time those intentions were mutually shared."  *Id.* at 133.

However, the inquiry does not end there, and an absence of shared intent to adopt a new habitual residence can be overcome where, "notwithstanding the intent of those entitled to fix the child's habitual residence, the evidence points unequivocally to the conclusion that the child has become acclimatized to his new surroundings and that his habitual residence has consequently shifted."  *Id.*  In noting this, the Second Circuit provided a fairly easy hypothetical example: a child

---

[5]Indeed, as well as the Fifth Circuit, the shared-intent approach is apparently followed in the First, Second, Fourth, Seventh, Eighth, and Ninth Circuits, and arguably in the Third as well.  *See Nicolson*, 605 F.3d at 104 n.2 (collecting cases, and citing the Third Circuit's decision in *Feder* among those following the shared-intent framework).

who spent fifteen years living in another country might be a habitual resident of the country, regardless of any parental intent to maintain a habitual residence elsewhere. *Gitter*, 396 F.3d at 133.

*Mozes* put this plainly: "[A] child can lose its habitual attachment to a place even without a parent's consent." *Mozes*, 239 F.3d at 1081. *Mozes* cautions courts should be "'slow to infer' that the child's acclimatization trumps the parents' shared intent." *Id.* at 1079. The Second Circuit describes this situation as "relatively rare." *Gitter*, 396 F.3d at 134.

In sum:

> First, the court should inquire into the shared intent of those entitled to fix the child's residence (usually the parents) at the latest time that their intent was shared. In making this determination the court should look, as always in determining intent, at actions as well as declarations. Normally the shared intent of the parents should control the habitual residence of the child. Second, the court should inquire whether the evidence unequivocally points to the conclusion that the child has acclimatized to the new location and thus has acquired a new habitual residence, notwithstanding any conflict with the parents' latest shared intent.

*Id.*

The Fifth Circuit is in accord with the foregoing discussion from *Mozes* and *Gitter*. *Larbie* states:

> In such cases, the threshold test is whether both parents intended for the child to "abandon the [habitual residence] left behind." Absent shared intent, "prior habitual residence should be deemed supplanted only where 'the objective facts point unequivocally' to this conclusion." Notably, when "the child's initial move from an established habitual residence was clearly intended to be for a specific, limited duration[,] . . . most courts will find no change in habitual residence." Mere retention in another country and "private reservations" or intentions that are made "manifest and definitive" only after the child has left its country of origin are generally insufficient to establish intent to change a child's habitual residence.

690 F.3d at 310–311 (citations omitted). As such, the Court finds its task is to first determine whether Headifen and Harker had a shared intent to abandon Texas as A.H.H.'s habitual residence,

to be followed by the question of whether objective facts unequivocally show New Zealand had nevertheless become A.H.H.'s habitual residence.

## II.     Application

## A.     Findings of Fact

As noted, the only legal element of Headifen's ICARA Petition which is at issue is whether New Zealand is A.H.H.'s habitual residence.  The other three elements are not in dispute: Harker removed A.H.H. from New Zealand "wrongfully," in that she acted without Headifen's consent or knowledge, surreptitiously spiriting the child out of the country, and pilfering shared bank accounts while doing so—exactly the sort of behavior the Hague Convention seeks to prevent.  In turn, Headifen undisputedly has rights of custody over A.H.H. under New Zealand law, *see* P-3, (Affirmation of Law by Inger Mai Blackford, Barrister), ¶¶ 7–22 (summarizing New Zealand laws on custody, guardianship, and the effect of overseas adoption orders, and applying them to the facts of this case), and Headifen was exercising those rights as of April 2, 2013.[6]  *See* 42 U.S.C. § 11603(e)(1)(A)–(B).  However, for the following reasons, the Court finds Headifen has failed to meet his burden as to the habitual-residence element.

Headifen and Harker gave conflicting testimony about the nature of their stay in New Zealand, with Headifen testifying it was intended to be of unlimited duration, and asserting there was no definite plan to ever return to Austin.  Harker testified the plan was always for the family to return to Austin, and the sojourn in New Zealand was originally intended to last for only twelve to eighteen months.  However, on cross-examination, Headifen admitted he agreed in July 2012 to return to the

---

[6]Citations to hearing exhibits are in the format P-[#] for Petitioner Headifen's exhibits, and R-[#] for Respondent Harker's exhibits.

United States.  Both sides produced supporting witnesses, as apparently some family friends sided with Headifen, and some with Harker.  Having observed the demeanor and substance of the conflicting testimony, the Court finds Harker and her supporting witnesses to be more credible on this point.

In particular, Headifen's testimony to the effect he and Harker never had any discussion about how long they would remain in New Zealand is simply not credible.  It is belied by Headifen's admitted knowledge Harker never wanted to live there permanently.  Although there was supporting testimony from Headifen's friends at the hearing, the Court finds their testimony means little, because social friends might well be unaware of a married couple's personal plans and conversations.[7]  Conversely, Harker's testimony regarding the intended limited duration of the time in New Zealand, and their conversations regarding the same, is credible.  Furthermore, it is supported by detailed testimony from two other persons, Sandra DeKock, and Tavia Conkling.  Both testified to having heard Harker and Headifen describe the trip to New Zealand as being limited to one year, or eighteen months, with an intention to ultimately return to Austin, possibly after traveling to other parts of the world.  Both confirmed Harker's testimony she did not like New Zealand, and would never have agreed to move there for an indeterminate period.  DeKock also testified Grant had more recently confirmed the couple's shared intention to return to Austin, sometime after they two had

---

[7]Headifen sought to bolster their testimony with the "evite" responses to a farewell party.  This party was co-hosted by a friend and pro-Headifen witness, Deborah Cardinal, shortly before the family left for New Zealand. *See* P-1 at 1.  The responses are short comments, in the nature of an RSVP, entered by some of the 116 invitees.  Headifen correctly notes none of the responses give any indication the family was expected to return.  But they equally give no indication the family was *not* going to return.  Rather, the responses are explanations of why particular invitees cannot attend, *id.* at 2 ("So sorry to miss the party tonight.  We have a house full of sick people!"), or affirming attendance, *id.* ("Would't miss it"), or other innocuous comments, *id.* ("Grants [sic] accent needed a little refreshing anyhow, he was starting to sound Texan.").

separated.   DeKock and Conkling both confirmed Harker's account of the couple's financial problems in New Zealand.

Harker testified, in strong terms, she could never reside permanently in New Zealand, and professed grave reservations about moving there at all.  This was apparently based on her impression of New Zealand following a visit there sometime after the couple was married, but before the events at issue here.  She explained she had only agreed to go in 2009 based on Headifen's promise the family would only remain in New Zealand for a year to eighteen months.[8]  To an American audience, her aversion to New Zealand—a name which evokes visions of a temperate island paradise, and Tolkien's Middle Earth—may seem rather strange.  However, having heard Harker's testimony on this point, the Court finds it credible.  Furthermore, it is confirmed by Headifen, who agreed during his own testimony Harker did not want to reside indefinitely in New Zealand.  Indeed, Headifen also admitted as much in his Hague Convention application, stating, "Vanessa had mentioned on many occasions about wanting to move back to Texas."  R-23 ¶ 19.  It was also confirmed, as noted above, by DeKock and Conkling.  Headifen volunteered he had hoped Harker would in time change her mind about New Zealand, but this was apparently a private reservation.  Such "private reservations" do not suffice to establish intent to change the minor's habitual residence.  *Larbie*, 690 F.3d at 311 (citing *Nicolson*, 605 F.3d at 104).

"Other times, however, circumstances are such that, even though the exact length of the stay was left open to negotiation, the court is able to find no settled mutual intent from which such

---

[8]Harker also testified, and the Court credits this testimony, Headifen pleaded with her to go, and ultimately persuaded her at least in part because of a professed desire to spend time with his aging mother, before she might pass away.  Harker further testified she was very nervous the night before the move to New Zealand, at which time Headifen again promised they would return.

abandonment can be inferred." *Mozes*, 239 F.3d at 1077.  This is just such a case.  It is apparent Headifen and Harker initially agreed to spend no more than a year or a year and a half in New Zealand.  This period was extended in light of their financial difficulties, which made it impossible to afford the expenses of moving back.  The parties agree Headifen agreed again in July 2012, following a crisis in their marriage, to return to Austin.  As noted below, he reiterated this promise in an email in October 2012.  Subsequently, it is undisputed Headifen prevailed upon Harker to extend the stay in New Zealand until March 2013, which is the end of the summer in antipodean New Zealand, and following Headifen's fiftieth birthday.

However, at no point prior to February 18, 2013, did either parent indicate a desire to abandon the previously agreed plan to return A.H.H. to Austin.  On February 18, Headifen announced to Harker that he had changed his mind, and openly conceded: "Obviously this means a change in that we're staying in New Zealand and not moving to Austin." P-11 at 1.  Significantly, the bulk of the February 18, 2013 email is a discussion of elementary schools in the Auckland area, with Headifen expressing his new desire to have A.H.H. "stay in Auckland for her schooling years." *Id.*  This is a stark departure from the previously shared intention of both parents to return A.H.H. to Austin for even her early education.

Any doubt on this score is dispelled by the great weight of other evidence in this case, including (1) the arrangements for A.H.H.'s education, (2) the family's housing, (3) pervasive official and business ties with Austin which endured throughout the time in New Zealand, and (4) as late as October 4, 2012, Headifen indicated his continued assent to return to Texas.[9]

---

[9]Headifen notes the Departure Card Harker submitted to New Zealand authorities, dated April 2, 2013, indicates she will be returning to New Zealand in one year.  This is outweighed by the overwhelming other evidence.  Furthermore, based on testimony at the hearing, Harker was leaving open access to New Zealand health care services, in the event

First, Headifen and Harker paid $50 to the International School to reserve A.H.H.'s enrollment there for the 2011–2012 school year. Headifen admitted to this at the hearing, and it is borne out by an August 1, 2011 invoice from the International School. R-11 at 1. On December 15, 2010, Headifen replied to a follow-up email from the Austin International School, inquiring as to whether A.H.H. should be kept on the 2011 enrollment list. His reply was as follows: "We are currently in New Zealand and not returning to Austin until 2012. Can you keep us on the wait list for then?" R-13 at 1. The International School replied by affirming this was "no problem." *Id.* This is significant, objective evidence, admitted without objection, and showing Headifen and Harker intended—both before they left Austin in late 2009, and in December 2010—to enroll A.H.H. in school in Austin, and thus intended to return to the United States.

Second, the family leased their Austin home, instead of selling it.[10] Indeed, it was Harker's undisputed testimony the Lost Horizon property was leased for a term of only eighteen months, even though the tenants sought a two-year term, because the family planned to return before a two-year lease would expire. Apparently, after the eighteen-month term expired, the lease continued on a monthly basis, and remains rented month-to-month to this day. Headifen agreed he could move back into the home merely by giving a thirty-day notice. Conversely, the family's living arrangements in

Headifen had prevailed in an ICARA proceeding. In addition, the possibility of returning to New Zealand after a year does not equate to any agreement on Harker's part to make New Zealand A.H.H.'s habitual residence. Finally, it was apparent to the undersigned Harker was fearful of being trapped in New Zealand, and conditioned her departure responses accordingly.

[10]Although Headifen suggested the only reason the house was not sold was the depressed nature of the real estate market in 2009, the Court discounts this testimony, because the market has subsequently improved. Headifen admitted on cross examination he had never made any effort or inquiry to sell the Lost Horizon property. Another reason Headifen's testimony on this point is not credible is if, as he asserted, there was no intention to return to Austin, and given the exhaustion of Headifen's savings, the natural thing to do would have been to sell the property.

New Zealand bespeak a temporary tenure.[11]   At first, they simply resided with Headifen's sister. Later, they leased, rather than purchased, a home.  After Headifen and Harker separated in 2012, Headifen moved back in with his sister, while Harker leased another residence.

Third, both Headifen and Harker retained numerous ties to the United States, and to Austin specifically.  Both maintained bank accounts and credit cards tied to Austin.  Harker voted in the American 2012 election.  They continued to file United States tax returns, for 2009 and 2010, and have a 2011 return still pending.  The Court also notes America is the only country of citizenship Headifen, Harker, and A.H.H. have in common.[12]

Of particular significance are various business ties Headifen retained with Austin.  His phone number remained a local, 512 area code, for which he paid an additional fee.  Headifen's web-based business, NauticEd, is conducted through a Texas limited liability company, Nautic7 Global Resources LLC.  NauticEd's website describes Headifen as being "*originally* from New Zealand," R-19 at 1 (emphasis added), and notes one of the places Headifen may be found is "on his Benetau 373 on Lake Travis in Austin, Texas." *Id.*  Headifen admitted NauticEd's business-contact phone number is his own Austin-area, 512 number.  Headifen's LinkedIn profile lists "Austin, Texas Area" as his location.  R-21 at 1.  On cross-examination, Headifen explained NauticEd is an "Austin company."

---

[11] Headifen argued the fact most of the family's furniture and personal possessions were shipped to New Zealand shows they had abandoned Austin.  It is true courts have looked to similar facts in weighting ICARA petitions. *See Ruiz v. Tenorio*, 392 F.3d 1247, 1256, 1258 (11th Cir. 2004).  However, Harker explained the couple's economic motivations for doing so: furnished accommodations in New Zealand were both expensive, and in poor condition, and it was easier to lease the Austin home if it was unfurnished.  Similarly, the habitual residence in *Ruiz* remained the United States, notwithstanding the couple's decision to ship their furniture to Mexico. *Id.* at 1259.

[12] Headifen's counsel suggests the Texas courts have no jurisdiction over determining custody of A.H.H., however, it is not this Court's place to determine state court jurisdiction.

-16-

Finally, in an email dated October 4, 2012, Headifen indicated his continued agreement to return to the United States. "I do care about you still and this is why I agreed to go back to Austin where there is a network of friends for you, and plenty of support for [A.H.H.]. Moving [A.H.H.] to a place where there is no network is not in the best interests for [sic] her." R-14 at 1. As noted above, Headifen and Harker agreed to move back to the United States in March, at the end of the New Zealand summer. That both parties had agreed to return to Austin after the summer is further evidenced by Harker's employment situation: Harker testified she gave three-month's notice as required by the contract with Warehouse Stationary in time to leave in March. In other words, Harker terminated her well-paying position with Warehouse Stationary in reliance on Headifen's promise they would return in March. Harker's testimony on this point is supported by the following: if Harker had not given three-months notice, she would have been in breach of her permanent-employment contract with Warehouse Stationary when she left New Zealand on April 2 of this year. To the contrary, Warehouse Stationary apparently does not regard her as having breached the permanent-employement contract, as evidenced by the fact Warehouse is presently still employing Harker remotely under a separate contractual arrangement.

Based on all of the foregoing evidence, the Court finds Headifen and Harker never had a shared intention to make New Zealand A.H.H.'s habitual residence. Rather, the Court finds they did have a shared intention, until February 18, 2013, to maintain Austin as A.H.H.'s habitual residence.

Having weighed the threshold question of parental intent, the Court must now consider whether "'objective facts . . . unequivocally'" indicate Headifen and Harker's shared intent to keep the United States as A.H.H.'s habitual residence was nevertheless supplanted by the practical effects of A.H.H.'s time in New Zealand. *Larbie*, 690 F.3d at 311 (quoting *Mozes*, 239 F.3d at 1082). The

-17-

Court finds no such unequivocal indication is present here. Headifen and Harker gave conflicting testimony as to what A.H.H.'s life in New Zealand was like. Headifen briefly testified A.H.H. was fully involved with his family and relatives in New Zealand, including aunts and uncles, and a nephew who is the same age. Harker testified Headifen's family wanted little to do with her or A.H.H., refused to spend time with A.H.H., and expected Harker to simultaneously care for her daughter and take over numerous other household responsibilities, while Headifen was constantly out sailing or engaged in other leisure pursuits without Harker or A.H.H. Headifen offered no other evidence to establish A.H.H.'s acclimatization to New Zealand. For some nine months, after Harker obtained employment, A.H.H.'s care was primarily handled by a French au pair, who apparently cared for A.H.H. at the family's leased home.[13] This is not indicative of integration into the New Zealand setting. Although A.H.H. was enrolled in a preschool afterwards, and presumably adapted to this setting in a normal way, the Court is not persuaded this is unequivocal evidence. The Eleventh Circuit similarly found enrollment in local schools did not suffice to establish habitual residence, given a variety of other factors indicating the stay in Mexico was intended to be temporary. *Ruiz v. Tenorio*, 392 F.3d 1247, 1255 (11th Cir. 2004).

**B.      Conclusions of Law**

Because there was no shared parental intent to make New Zealand the habitual residence, and because there are not unequivocal facts demonstrating A.H.H. nevertheless became acclimated to New Zealand, the Court concludes Austin, not New Zealand, remains A.H.H.'s habitual residence. *Larbie*, 690 F.3d at 310–311; *id.* at 312 ("[W]e determine that the record establishes that K.L.'s

---

[13] At this time, Headifen remained, as he was for the entire time in New Zealand, unemployed, save for his work on the NauticEd website.

presence in the U.K. was to last for a limited duration; that [the respondent] never agreed to any

other arrangement; and that no special circumstances justify departing from courts' general practice

of finding no change in habitual residence in such cases."); *see also Ruiz*, 392 F.3d at 1252–53.  As

such, Headifen has failed to establish a necessary element for relief under ICARA, and his Petition

must be denied.

> *Ruiz* provides the following confirmation:

>> There, as was the case here, the husband promised a conditional stay, i.e. one
>> that could be terminated if it did not work out. Additionally, the extended period of
>> time that the family stayed was not because the wife wanted to remain in Austria but
>> because of the family's desire not to disrupt the children. That is similar to what
>> happened here: Melissa returned [to Mexico] in 2002, but only because Juan
>> persuaded her to return and try to save the marriage. In other words, attempts to
>> salvage the marriage, rather than commitment to staying in the new locale are what
>> determined the length of the stay in both cases.

*Id.* at 1258–59  Substitute "temporary stay" for "conditional stay," and "financial necessity" for

attempts to "save the marriage," and the closeness of this case to *Ruiz* is particularly apparent.

A decision from the District Court of Utah involved similar problems, and is also

illuminating.  In *In re Ponath*, "what began as a voluntary visit to petitioner's family in Germany,

albeit an extended visit, might be viewed by the court as a change of habitual residence of the minor

child but for respondent's intent and desire to return to the United States with the minor child and

petitioner's willful obstruction of that purpose."  829 F. Supp. 363, 367–68 (D. Utah 1993).

Although the "willful obstruction" was more aggravated in *In re Ponath*, consisting of overt physical

and verbal abuse, the principle is the same: the parents had a shared intent to undertake a temporary

sojourn in another country, which was then extended past the intended time by unforseen

circumstances.  *Id.* at 368.  Because it nevertheless was not the shared intent of the parents to make

Germany the minor's habitual residence, the petition to compel return of the minor to Germany was denied. *See id.*

Headifen argues the duration of A.H.H.'s time in New Zealand must be dispositive because of its length, and points out Harker has failed to indicate any other case in which a three-and-a-half year sojourn did support a finding of habitual residence in the removed-from state. However, the Court is unpersuaded by this argument, because there is "no bright line rule with respect to the length of an absence." *Ruiz*, 392 F.3d at 1253. Similarly, the Ninth Circuit in *Mozes* cautioned, "it is 'not desirable, indeed it is not possible, to enter into any game of numbers on the duration required.'" *Mozes*, 239 F.3d at 1074 (quoting *Adderson v. Adderson* (1987), 51 Alta. L.R. 2d 193, 198 (Alberta C.A.)). The Court particularly notes the Eleventh Circuit was unconcerned by a comparably lengthy stay. There, the minors resided in Mexico for two years and ten months. *Ruiz*, 392 F.3d at 1250. Nevertheless, because of the lack of shared intent to make Mexico the habitual residence, and the absence of unequivocal circumstances showing Mexico had become the habitual residence, the court affirmed the district court's finding the children's habitual residence remained the United States. *Id.* at 1259. The Court therefore rejects Headifen's reliance on the length of A.H.H.'s stay in New Zealand. Three and a half years is a long time, but it is not much greater than two years and ten months, and is far less than the example of fifteen years put forth by *Mozes* and *Gitter*. Moreover, the time in question would have been some six months shorter, but for Headifen's insistence the parties remain in New Zealand through the summer, until March of this year. More importantly, because there is no bright-line rule as to the length of time, the Court finds this fact, standing alone

or in conjunction with the limited evidence of acclimatization Headifen produced, fails to unequivocally indicate habitual residence in New Zealand was established.[14]

In addition, the Fifth Circuit has specifically cautioned, "shared intentions [should] be the primary focus in the habitual residence inquiry," particularly when the minor is of a young age. *Larbie*, 690 F.3d at 311. This is because: "To focus on a young child's experience encourages future 'would-be abductor[s] to seek unilateral custody over a child in another country' or to delay returning to the child's original habitual residence as long as possible." *Id.* (quoting *Mozes*, 239 F.3d at 1079. "The greater the ease with which habitual residence may be shifted without the consent of both parents, the greater the incentive to try." *Mozes*, 239 F.3d at 1079.

Alternatively, even if the child-centric approach is the proper one, the Court would nevertheless reach the same conclusion. First, there was very little evidence presented showing A.H.H. was in fact acclimated to New Zealand. That evidence came solely from Headifen, and the Court finds Headifen non-credible. Rather, the Court credits Harker's account, which showed she was raising A.H.H. in New Zealand in relative isolation, with an unfriendly set of in-laws who took little interest in A.H.H.

In addition, the child-centric cases from the Third and Sixth Circuits are factually distinguishable from this case in important ways. In *Friedrich*, the minor "was born in Germany and resided exclusively in Germany until his mother removed him to the United States on August 2, 1991; therefore, [the minor] was a habitual resident of Germany at the time of his removal." 983

---

[14]Headifen's learned counsel, with years of experience in ICARA cases, argues the duration of time in New Zealand alone establishes habitual residence as a matter of law. However, this flies in the face of both binding precedent in *Larbie*, and the highly persuasive, well-reasoned precedents from the Ninth and Eleventh Circuits. Rather, as found here, the parents were in explicit agreement as late as October 2012 to return to the United States. As such, the period of time which is truly at issue is the short months between October 4, 2012, and April 2, 2013.

F.2d at 1402.  By contrast, A.H.H. was born in the United States, and did not reside exclusively in New Zealand.  More importantly, the mother in *Friedrich* unsuccessfully contended the minor's habitual residence transferred to the United States simply because the German father kicked the other members of the family out of their German apartment, a factual circumstance which has nothing to do with residing in the United States.  *Id.* at 1401–02 ("[The minor]'s habitual residence in Germany is not predicated on the care or protection provided by his German father nor does it shift to the United States when his American mother assumes the role of primary caretaker.").

*Feder v. Evans-Feder* from the Third Circuit is similarly distinct.[15]  There, the parents had purchased (and extensively renovated) a home in Australia.  63 F.3d at 224.  They were jointly planning on living in Australia "for at the very least the foreseeable future."  *Id.*  Significantly, the minor was not only enrolled in preschool, the parents further took steps to enroll the minor in a private school for the fifth grade, some seven years later.  *Id.* at 219.

In closing, the Court observes one of the main concerns of the Hague Convention is not present here.  The Convention seeks to prevent one parent from obtaining "'sole care and control over a son or daughter in a new jurisdiction.'"  *Mozes*, 239 F.3d at 1070 (quoting BEAUMONT & MCELEAVY, THE HAGUE CONVENTION ON INTERNATIONAL CHILD ABDUCTION 1 (1999)).  Here, Headifen is manifestly capable of residing in the United States and exercising joint care over A.H.H., as he lived and worked in this country for twenty-four years previously, and remains an American

---

[15]It also bears noting, while *Feder* emphasizes looking to the child first, much of the analysis in the Third Circuit's opinion is in fact directed at the intentions of the parents. "[T]he [district] court disregarded the present, shared intentions of both Mr. and Mrs. Feder with regard to [the minor]'s stay in Australia, focusing instead on Mrs. Feder exclusively and on the facts which indicated that she did not intend to remain in Australia if her marriage ended at some future date." *Feder*, 63 F.3d at 224. As such, *Feder* is not entirely inconsistent with the approach followed in the Fifth and Ninth Circuits, and the Court would reach the same conclusion if *Feder* were binding upon it. *See Nicolson*, 605 F.3d at 104 n.2 (including *Feder* among the shared-intent decisions).

citizen.  This is not a case in which one parent has absconded to a place the other parent cannot follow.  Nor is there any reason to believe Headifen will be somehow at a necessary disadvantage in the courts of Texas.

## Conclusion

The Court does not condone Harker's actions or methods.  One parent's unilateral, stealth removal of the child is the type of conduct the Hague Convention was crafted to prevent.  However, the Court equally notes she was driven to do so by Headifen's broken promises and failure to take financial responsibility for his family.  In any event, Headifen has failed to meet his burden under ICARA.

Accordingly,

IT IS ORDERED that Petitioner Grant Rawston Headifen's Request for Expedited Consideration [#2] is GRANTED;

IT IS FURTHER ORDERED that Headifen's  Verified Petition for Return of Child to New Zealand [#1] is DENIED;

IT IS FURTHER ORDERED that the Court's Temporary Possession Order of May 14, 2013 [#16] is DISSOLVED;

IT IS FINALLY ORDERED that the Clerk of this Court shall mail a certified copy of this order to the clerk of the 261st District Court of Travis County, Texas.

SIGNED this the  7th  day of June 2013.

_Sam Sparks_
SAM SPARKS
UNITED STATES DISTRICT JUDGE